**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Yana Hart (SBN 306499)
*yhart@clarksonlawfirm.com*
Mark Richards (SBN 321252)
*mrichards@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050

**THE FERRARO LAW FIRM, P.A.**
James L. Ferraro (*PHV forthcoming*)
*jferraro@ferrarolaw.com*
James L. Ferraro Jr. (*PHV forthcoming*)
*james@ferrarolaw.com*
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Tel: (305)375-0111

**SULTZER & LIPARI, PLLC**
Jason R. Sultzer (*PHV forthcoming*)
*sultzerj@thesultzerlawgroup.com*
Scott E. Silberfein (*admitted PHV*))
*silberfeins@thesultzerlawgroup.com*
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Tel: (845) 483-7100
Facsimile: (888)749-7747

**LEEDS BROWN LAW, P.C.**
Jeffrey K. Brown (*PHV forthcoming*)
*jbrown@leedsbrownlaw.com*
Blake Hunter Yagman (*admitted PHV*)
*byagman@leedsbrownlaw.com*
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel: (516) 873-9550

*Attorneys for Plaintiffs S.K., D.G. and D.C.
and the Proposed Classes*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.K., D.G., and D.C., on behalf of themselves and all others similarly situated, | Case No.  5:24-cv-09090-SVK |
| *Plaintiffs*, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| JUPITER RESEARCH, LLC; 3WIN CORPORATION; CB SOLUTIONS, LLC; GREENLANE HOLDINGS, INC.; SHENZHEN SMOORE TECHNOLOGY COMPANY, LIMITED; and SMOORE INTERNATIONAL HOLDINGS LIMITED, | |
| *Defendants*. | |

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

Plaintiffs S.K., D.G., and D.C. ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following Class Action Complaint (the "Action") against Defendants Jupiter Research, LLC ("Jupiter"), 3Win Corporation ("3Win"), CB Solutions, LLC ("CB Solutions"), Greenlane Holdings, Inc. ("Greenlane"), Shenzhen Smoore Technology Company, Limited ("Shenzhen Smoore") and Smoore International Holdings Limited  ("Smoore Holdings") (collectively, "Defendants")[1], under federal and state law upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel seeking actual damages, treble damages, restitution, disgorgement of profits, a declaratory judgment, injunctive relief, pre- and post-judgment interest, and reasonable costs and attorneys' fees, as follows:

# I. INTRODUCTION

1. Across 38 states the consumption of cannabis is legal for either medicinal or recreational use.  Millions of Americans use cannabis in a variety of methods consistent with their respective states' laws.  In many states, one of the only lawful ways to consume cannabis is through vaporization.

2. According to the National Institute of Health ("NIH"), "[v]aporization includes the heating of hash oil or cannabis plant material to release aerosolized cannabinoids, including tetrahydrocannabinol ("THC") and cannabidiol, and is often combined with water vapor and inhaled."[2]  The NIH states that, "[c]annabis vaporization devices range from . . . small portable pen-shaped devices, much like electronic cigarettes."[3]  These closed cannabis oil vaporizing systems, which includes a reusable electronic "pen" with a mouthpiece that attaches to a cartridge filled with cannabis oil or extract, are one of the only ways to consume cannabis products in many jurisdictions around the United States.  Some cannabis pens are also "all-in-one" devices, which include all the

---

[1] Defendants Jupiter, 3Win, CB Solutions, and Greenlane are referred to collectively hereinafter as "Distributor Defendants."  Defendants Schenzen Smoore and Smoore Holdings are collectively referred to as "Smoore."

[2] Elizabeth R. Aston, Samantha Farris, Jane Metrik, and Rochelle K. Rosen, "*Vaporization of Marijuana Among Recreational Users*" J. STUD. ALCOHOL DRUGS (2019), at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6396515/ (last accessed February 28, 2025).

[3] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

component parts in one piece. Both categories of devices collectively make up the two different types of products at-issue in this Action, though as much as 85-90% of all closed cannabis oil vaporization uses a reusable pen with an inserted cartridge as opposed to a disposable all-in-one device. As such, the relevant market at issue in this Action includes closed cannabis oil vaporizing systems sold throughout the entirety of the United States (the "Relevant Market").

3.     At issue in this case are the actions of a monopolist in the Relevant Market, Smoore, who produces as much as 80% of the closed cannabis oil vaporizer systems in the United States. In order to entrench its monopoly power, Defendants engage in a slew of anticompetitive conduct which result in higher prices, poorer quality products in terms of efficacy and safety, and a lack of necessity for innovation to create better products.

4.     The products distributed by the Distributor Defendants and sold by Smoore include the following: (1) a first tray of deformable material with voids for holding cartridge bodies; (2) the cannabis cartridges themselves (without cannabis oil in them); (3) a cover that conceals the first tray; (4) a second tray of deformable material with voids for holding mouthpieces; and (5) the cannabis cartridge mouthpiece (the "Products").

5.     These Products are sold under the 'CCELL' brand (manufactured by Smoore and distributed to cannabis retailers to be filled with cannabis oil by the Distributor Defendants) and have been in the stream of commerce since 2016. Additionally, with respect to all-in-one products, CCELL component parts are sent to various cannabis producers directly as well as distributed through the Distributor Defendants to cannabis producers who then combine CCELL components into an all-inclusive device.

6.     Cannabis vaporization offers one of the healthiest ways to consume cannabis. Because of the health impacts and ease of use, cannabis vaporization has become a wildly popular industry that has continued to grow over the past decade. Furthermore, for medicinal cannabis consumers, cannabis vaporization represents one of the more precise methods of cannabis consumption used to address pain.

7.     As cannabis vaporization has grown, so too has Smoore. However, Smoore's growth is not entirely organic as it has engaged in a long running campaign in violation of the antitrust laws

FIRST AMENDED CLASS ACTION COMPLAINT

to dominate the Relevant Market.

8.    Smoore's anticompetitive conduct includes a multitude of unsavory acts.

9.    Smoore's distributor agreements, which are the agreements made with the Distributor Defendants, are unlawful under the antitrust laws because the agreements for CCELL products (i) contain illegal exclusivity agreements which forbid distributors from selling competing products; (ii) include mandatory price restraints that require distributors sell downstream at prices set by Smoore (iii) banned competition whereby Smoore's distributors are banned from selling Smoore's products to Smoore's competitors; and (iv) include the collection of security deposits on sales to penalize distributors who do not comply with Smoore's pricing restraints.

10.    These restrictions foreclose market entry for smaller entrants, fix prices vertically for downstream purchasers (leading to higher, fixed, or stabilized prices for end-consumers), harm both intra-brand and interbrand competition in the Relevant Market and, because Smoore sells its products directly to consumers, horizontally restrain competition between Smoore and Smoore's distributors (including the Distributor Defendants).

11.    This conduct has the effect of fixing prices in the Relevant Market, leading to higher prices for consumers, poorer quality and less safe products, throttled innovation and a lack of inter-brand and intra-brand competition.

12.    Absent the distributor agreements, Smoore and Distributor Defendants ensure that cannabis oil producers and end consumers, like Plaintiffs and the Class members, paid higher prices for closed cannabis oil vaporizer systems than they otherwise would have.

13.    Smoore heavily polices their restrictive agreements to prevent competition and increases prices on closed cannabis oil vaporizer system customers who do not buy directly from Smoore.

14.    Critically, Smoore's iron grasp on the cannabis vaporization market and the cooperation of Smoore's distributors (the Distributor Defendants) ensnares vulnerable cannabis users who depend on cannabis as a form of medicine for severe pain and other ailments.

15.    Finally, Smoore engages in both vertical and horizontal price fixing, as it insulates its distributors from nascent competition and, if a distributor attempts to compete on price in the

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Relevant Market, Smoore would be contacted and asked to enforce the agreement between the distributors by warning the other distributors against competing.

16.    Over 2,000 brands use CCELL's products, including some of the most popular cannabis brands sold in dispensaries, including GTI, Curaleaf, Cresco, Raw Garden, and others. Because so many brands use CCELL products, consumers are harmed by Smoore's anticompetitive agreements with distributors without even knowing that they purchased a Smoore CCELL product. This is because cannabis brands do not disclose which products in the Relevant Market that they use, however, much of the brands that exist use CCELL.  What consumers do know, however, is that they pay excessively high prices on finished products which contain cannabis in them – and that the impact of this is caused by the downstream passage of supracompetitive prices from distributors to dispensaries, and then, ultimately, to end consumers.

17.    Against this backdrop, Plaintiffs bring this lawsuit against Smoore and Distributor Defendants on behalf of themselves and all other similarly situated indirect purchasers under Section 1 of the Sherman Antitrust Act, the various state antitrust laws and under the common law doctrine of unjust enrichment seeking actual damages, treble damages, restitution, disgorgement of profits into a constructive trust, declaratory relief, injunctive relief, pre- and post-judgment interest, as well as reasonable costs and attorney's fees associated with the prosecution of this Action.

## II.    PARTIES

### Plaintiff S.K.

18.    Plaintiff S.K. is a citizen and resident of this District, in Walnut Creek, California.

19.    As a resident of California, Plaintiff S.K. is legally allowed to purchase and/or consume vaporized cannabis oil for his personal individual, recreational or medicinal use.  Plaintiff S.K. has purchased products in the Relevant Market at a licensed dispensary during the Class Period (January 1, 2020 through the present day).

20.    Each of these products represents an indirect purchase from Defendants.  Throughout the Class Period, Plaintiff S.K. has spent thousands of dollars on cannabis vaporizers, including the brands which utilize Smoore's CCELL products and technology.

Clarkson Law Firm, P.C.    |    22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050    F: (213) 788-4070    |    clarksonlawfirm.com

21.    Plaintiff S.K. paid supracompetitive prices for products in the Relevant Market as a result of Defendants' conduct as alleged herein.

***Plaintiff D.G.***

22.    Plaintiff D.G. is a citizen and resident of Las Vegas, Nevada.

23.    As a resident of Nevada, Plaintiff D.G. is legally allowed to purchase and/or consume vaporized cannabis oil for his personal individual, recreational or medicinal use.  Plaintiff D.G. has purchased products in the Relevant Market at a licensed dispensary during the Class Period (January 1, 2020 through the present day).

24.    Each of these products represents an indirect purchase from Defendants.  Throughout the Class Period, Plaintiff D.G. has spent hundreds of dollars on cannabis vaporizers, including the brands which utilize Smoore's CCELL products and technology.

25.    Plaintiff D.G. paid supracompetitive prices for products in the Relevant Market as a result of Defendants' conduct as alleged herein.

***Plaintiff D.C.***

26.    Plaintiff D.C. is a citizen and resident of Winchester, Virginia, but previously lived in Los Angeles, California and Long Island, New York.

27.    As a resident of California and New York, Plaintiff D.C. was legally allowed to purchase and/or consume vaporized cannabis oil for her personal individual, recreational or medicinal use.

28.    Plaintiff D.C. has purchased products in the Relevant Market at a licensed dispensary during the Class Period (January 1, 2020 through the present day).

29.    Each of these products represents an indirect purchase from Defendants.  Throughout the Class Period, Plaintiff D.C. has spent hundreds of dollars on cannabis vaporizers, including the brands which utilize Smoore's CCELL products and technology.

30.    Plaintiff D.C. paid supracompetitive prices for products in the Relevant Market as a result of Defendants' conduct as alleged herein.

***Defendant Shenzhen Smoore Technology Company, Limited***

31.    Defendant Shenzhen Smoore is a corporation organized under the laws of China,

having its principal place of business located at Block 16, Dongcai Industry Park, Gushu Village, Bao'an District, Shenzhen, China.

32.    According to Smoore, "[f]ounded in 2009, Smoore is a global leader in vaporization technology solutions, manufacturing vaping devices and components for many vape brands and household names around the world... Smoore's cannabis-focused brands include CCELL [products]."

33.    Smoore is the largest vaping device manufacturer in the world, accounting for nearly 23% of the global market share in 2021.

34.    Smoore has continuously advertised, marketed, promoted, and sold its CCELL products, including through licensed distributors, in U.S. commerce since at least as early as March 1, 2016.

35.    Smoore's CCELL's factory is located in Shenzhen, China and Smoore employs over 10,000 employees globally, some of whom reside in the United States.

36.    Smoore transacts directly with Distributor Defendants to provide vaping OEM products and custom designs for consumers in the U.S., including this District.

37.    Smoore frequently consents to personal jurisdiction in United States courts, as it has filed numerous patent and intellectual property cases in the United States since 2016, including in the Southern District of New York as well as in the Central District of California.

### Defendant Smoore International Holdings Limited

38.    Smoore Holdings is a corporation organized under the laws of the Cayman Islands, having its principal place of business located at Block 16 Dongcai Industry Park, Gushu Villiage, Bao-an District, Shenzhen, China.

39.    Smoore Holdings is a publicly traded corporation listed on the Hong Kong Stock Exchange.

40.    Smoore Holdings is the parent corporation of Defendant Shenzhen Smoore, which is its wholly owned subsidiary.

41.    There exists, and at all times herein mentioned existed, a unity of ownership between Defendants Smoore Holdings and Shenzhen Smoore and their agents such that any individuality or

6

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

separateness between them has ceased and each of them is the alter ego of the others. Adherence to the fiction of the separate existence of Defendants Shenzhen Smoore and Smoore Holdings, would, under the circumstances set forth in this complaint, sanction fraud, or promote injustice.

42.    On information and belief, Defendant Smoore Holdings directs, oversees, and controls virtually all aspects of Defendant Shenzhen Smoore's day-to-day business operations, including pricing strategy, distributor selection, marketing, sale, research and development, contract negotiations, product manufacture and design for the CCELL products at issue.

43.    To that end, Smoore Holdings and Shenzhen Smoore share key executive leadership and corporate decision makers as evidenced by its public statements.

44.    For example, in 2020, Smoore Holdings published its global share offering presentation in connection with its listing on the Hong Kong Stock Exchange. In that report, Smoore Holdings identified its Executive Directors, many of which were also corporate officers, executives, managers, or directors of Defendant Shenzhen Smoore.  For example, Chen Zhiping the chairman of Smoore Holdings serves  as the "general manager" of Smoore Shenzhen and is also the founder of Smoore Shenzhen.  Moreover, Xiong Shaoming is executive Director and the vice general manager for Smoore Holdings and has served as the Vice General Manager of Smoore Shenzhen since 2009.  Smoore Holdings' global share presentation also indicated that Mr. Chen and Mr. Xiong were collectively entitled to exercise and control approximately 36.80% of the entire issued share capital for Smoore Holdings.

**Defendant Jupiter Research, LLC**

45.    Defendant Jupiter a limited liability company with its principal place of business located in Phoenix, Arizona.

46.    Jupiter is one of four companies that distributes Smoore's products throughout the Relevant Market.  According to Jupiter, "Jupiter … introduced the first CCELL by Smoore devices into the U.S. market in 2016."

47.    Upon information and belief, Jupiter first entered its distribution agreements with the aforementioned anticompetitive clauses with Smoore as early as 2016.  Jupiter has sold millions of CCELL products throughout the Americas, Europe and Israel.

FIRST AMENDED CLASS ACTION COMPLAINT

**Defendant 3Win Corporation**

48.    Defendant 3Win is a corporation with its principal place of business located in Tempe, Arizona.

49.    3Win is one of four companies that distributes Smoore's products throughout the Relevant Market. According to 3Win, it is the "preferred" wholesale distributor of Smoore's CCELL vape products.

50.    Upon information and belief, 3Win entered into Smoore's distribution agreements with the aforementioned anticompetitive clauses as late as 2019, though perhaps significantly earlier.

**Defendant CB Solutions, LLC**

51.    Defendant CB Solutions (doing business as "Canna Brand Solutions") is a limited liability company formed under the laws of the State of Washington with its principal place of business located in Everett, Washington.

52.    On information and belief, Daniel Allen and Kevin C. Ross are the only members of CB Solutions, and each of them are domiciled in the State of the State of Washington.

53.    CB Solutions is one of four companies that Smoore identifies on its website as authorized to distribute its products throughout the Relevant Market.  On its website, CB Solutions holds itself out to be "an Official CCELL Distributor."

54.    Upon information and belief, CB Solutions entered into Smoore's distribution agreements with the aforementioned anticompetitive clauses as early as 2017.

**Defendant Greenlane Holdings, Inc.**

55.    Defendant Greenlane is a corporation with its principal place of business located in Boca Raton, Florida.

56.    Founded in 2005, Greenlane is publicly traded under the ticker "GNLN" on the NASDAQ.  According to Greenlane, "Greenlane operates as a powerful house of brands and is the premier global platform for the development and distribution of premium cannabis accessories, packaging, vape solutions, and lifestyle products… Greenlane is a partner of choice as a third-party brand accelerator and omni-channel distribution platform for many of the industry's leading multi-

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050    F: (213) 788-4070  |  clarksonlawfirm.com

state operators, licensed producers, and brands."

57.    Greenlane is one of four companies that distributes Smoore's products throughout the Relevant Market.  According to Greenlane, Greenlane "ha[s] enjoyed a strong partnership with Smoore (via [Greenlane's] CCELL distribution business") since 2018.

58.    Upon information and belief, Greenlane entered into distribution agreements with the aforementioned anticompetitive clauses as early as 2018.

## III.    JURISDICTION AND VENUE

59.    *Subject Matter Jurisdiction.*  Plaintiffs S.K., D.G. and D.C. bring this Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to remedy violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as under state antitrust laws and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337 and 1367.  This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims arising under the federal antitrust laws, and Plaintiffs bring this Action to remedy violations of the Sherman Act.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

60.    Additionally, this Court also has subject matter jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act of 2005 ("CAFA").  *See*, 28 U.S.C. § 1332(d).  This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds the sum of $5,000,000.00 (exclusive of costs and interest), there are more than 100 putative members of the Class and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendant.

61.    *Personal Jurisdiction.*  This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant either directly or through the ownership and/or control of its subsidiaries: (a) transacted business throughout the United States, including in this District; (b) transacted for the distribution or sale of Smoore's CCELL products throughout the United States and in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050    F: (213) 788-4070  |  clarksonlawfirm.com

9

1  residing in, located in, or doing business throughout the United States, including in this District.

2  62.    Because this case arises under the Sherman Act, this Court has personal jurisdiction

3  over the Defendant Smoore, foreign entities, based on their contacts with the United States as a

4  whole, including but not limited to its distribution agreements with the Distributor Defendants to

5  sell, market, distribute, market, and sell its CCELL products throughout the United States. *See*

6  *Shields v. Federation Internationale de Natation*, 419 F. Supp. 3d 1188, 1202 (2019) ("There is no

7  dispute that the relevant forum for the Court's jurisdictional analysis in these antitrust actions is the

8  United States as a whole, and not merely California").

9  63.    The Smoore Defendants have contractual agreements with the Distributor Defendants

10  to sell, market, promote, advertise, and distribute its CCELL brand cannabis oil vaporizer systems

11  products both by selling directly to cannabis oil and extract producers throughout the United States,

12  including this District.

13  64.    In 2016, Defendant Shenzhen Smoore submitted a declaration in support of a motion

14  to dismiss for lack of personal jurisdiction. This declaration, provided by Wang Xin confirming that

15  Shenzhen Smoore maintained distributors across the United States for its CCELL products marketed

16  under the "Vaporesso" brand name, including five distributors in the State of California. On

17  information and belief, Smoore has maintained contractual agreements with these distributors to

18  sell its CCELL products during the entire period relevant to Plaintiffs' claims in this action.

19  65.    On information and belief, the Smoore Defendants also maintain a network of

20  employees, agents, and or contractors who conduct various advertising, marketing, sales, and

21  distribution functions directly on their  behalf in the United States, including the State of California.

22  66.    *Venue.*  This District is the proper venue for this litigation because pursuant to Section

23  12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b)-(c) because one or more Defendants

24  transacted business or is otherwise subject to personal jurisdiction in this District, and a substantial

25  portion of the affected interstate trade and commerce described below has been carried out in this

26  District.

27

28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

FIRST AMENDED CLASS ACTION COMPLAINT

## IV.    FACTUAL ALLEGATIONS

### *Cannabis Consumption in the United States*

67.    In the United States, cannabis-derived products were used as medicine for various ailments and for chronic pain during the 19th and into the 20th century.  With the passage of the Marihuana Tax Act, stringent federal restrictions on the use and sale of cannabis in the U.S. began in 1937.  And, from about 1937 through the mid-1990's, cannabis consumption of any kind was more-or-less forbidden throughout the U.S.

68.    However, in 1996, California became the first state to allow the consumption of cannabis for medicinal purposes.  And, in the time since, the trend of legalization for medicinal purposes spread to a majority of states by 2016.

69.    Additionally, several states have legalized cannabis consumption – though with differing rules on specific types of consumption – for recreational use, beginning with Washington and Colorado in 2012.

70.    The current patchwork of state-by-state cannabis consumption laws appear as follows:



FIRST AMENDED CLASS ACTION COMPLAINT

71.    In a very short amount of time, cannabis had been legalized in state markets across the country.  This drastic and rapid change in policy left many previously barred entrants rushing to get a piece of this newly formed legal market for cannabis.

72.    The rush to enter this new market, however, was not limited just to manufacturers of actual cannabis.  The wave of new cannabis legalization in the United States also led to booming interest in new forms of cannabis consumption, including through the use of vaporization and vaporizer technology.  Under cannabis prohibition, cannabis consumption methods were limited by the lack of professional cannabis producers investing research and development efforts into improving existing cannabis consumption methods.  After legalization, cannabis producers looked for innovative ways to improve the cannabis experience for consumers, including through wider use of cannabis oils for use in vaporizers.

73.    Vaporizer manufacturers, like Smoore, rushed to join this newly booming and burgeoning cannabis vaporization products market.  Existing vaporization technology at the time was created for nicotine as opposed to cannabis oil.  Liquids containing nicotine are not viscous and are homogenous; in comparison, cannabis oils are less stable, more viscous, and less homogenous.  It is difficult to leverage nicotine vaporizer technology into the Relevant Market without substantial improvements.  For example, many early vaporizer manufacturers used cotton wicks to heat cannabis oil, leading to a bitter and foul taste, burned oil, and the high risk of leakage and clogging.

74.    Today, vaporization of cannabis products is extremely popular and is easily differentiated from other consumption methods, as explained below.  Cannabis consumption in the United States has skyrocketed in-part due to the popularity as well as the relative and simple ease of consumption that cannabis oil vaporizers provide.

### *The Relevant Market*

75.    Closed cannabis oil vaporizer systems are a highly specialized product utilized by a group of core and sophisticated cannabis oil manufacturers and consumers whose preferences are strong enough to constitute an independent antitrust market, the Relevant Market.

76.    ***Consumption and the Relevant Market.***  Cannabis, according to the NIH, refers to the "dried leaves, flowers, stems and seeds from the Cannabis sativa L plant.  The plant contains the

chemical THC and other similar compounds.  Extracts can also be made from the cannabis plant."

77.    Cannabis can be sold as a solid, usually as either a resin or as a dried plant material; cannabis can also be mixed into food products and sold as ingestible "edible" products; or, and relevant to this Action, cannabis can be extracted into oils and waxes.

78.    Products designed for cannabis inhalation generally fall into two categories: smoking products and vaporizer products.  While smoking products rely on combustion to produce smoke that is inhaled into the lungs, vaporizer products do not involve burning or smoking.  Instead, vaporizer products vaporize or aerosolize cannabis oil or extracts.

79.    ***Cannabis Vaporizers.***  Cannabis vaporizers include both open and closed cannabis systems.  In an open cannabis vaporizer system, the consumer separately purchases cannabis without a reservoir, such as dried cannabis plant material (or "flower"), which is then inserted into the vaporizer device by the consumer.  An image of an open cannabis vaporizer system (which was taken from the New York Times) can be seen below:



80.    In contrast, and relevant to this Action, are closed cannabis oil vaporizer systems.  These products are purchased by the consumer and include both the cannabis product and the reservoir, which is pre-filled by a downstream cannabis manufacturer that purchases closed cannabis

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

vaporizer system products from distributors like the Distributor Defendants. The initial products (into which the cannabis oil is inserted) is produced by a manufacturer of products in the Relevant Market, like Smoore.

81.    Of the closed cannabis oil vaporizer systems, there are two different kinds: (1) all-in-one devices and (2) vape cartridge pens. The latter includes a reusable electronic "pen" with a mouthpiece that attaches to a cartridge filled with cannabis oil. Some cannabis pens are also "all-in-one" devices, which include all the component parts in one piece. All-in-one devices are generally regarded as a different product than the reusable electronic pens because all-in-one devices are disposable and the non-cannabis components of the pen cannot be reused after all the cannabis oil or extract in the cannabis cartridge attached to the pen is entirely consumed.

82.    An example of an all-in-one, disposable cannabis vaporizer pen appears as follows:



83.    This image is of a finished cannabis oil vaporizer product which incorporates a closed cannabis oil vaporizer system product and cannabis oil.

84.    An example of a reusable cannabis oil vaporizer appears as follows:

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050    F: (213) 788-4070  |  clarksonlawfirm.com



13    85.    ***Geographic Market.***    The relevant geographic market for closed cannabis oil

14  vaporizer systems is the entirety of the United States.  Cannabis is currently legal for recreational

15  use in 24 states, and for medical use in an additional 14 states – for a total of 38 out of 50 states.

16  While each state's cannabis market is localized to within the borders of that respective state, the

17  market for closed cannabis oil vaporizer products is nationwide, as closed cannabis oil vaporizer

18  systems not containing cannabis, such as the products at issue in this Action, can be shipped

19  nationwide.

20    86.    ***Interchangeability.***  Vaporizer systems are not generally interchangeable with other

21  methods of consuming cannabis, including smoking and edible consumption.  Vaporizers are

22  generally regarded as less harmful than smoking products because vaporizers do not entail the

23  inhalation of carcinogen-rich smoke.  Vaporizer products are also more discreet and easier to use

24  than smoking products.

25    87.    By comparison, edibles are absorbed differently because they interact with the

26  digestive system as opposed to interacting with the pulmonary system.  Smoking is seen as more

27  harmful to health than edibles and vaporization.

28

FIRST AMENDED CLASS ACTION COMPLAINT

88.    With respect to vaporizers specifically, cannabis vaporizers include both open and closed cannabis systems.  In an open cannabis system, the cannabis consumer separately purchases cannabis without a reservoir, such as dried cannabis flower, which is then inserted into a vaporizer device by the consumer.  In contrast, the closed cannabis vaporizer system requires the purchase of both the cannabis product and the reservoir at once – which is prefilled by the cannabis product manufacturer.

89.    Closed cannabis oil vaporizer systems are often much smaller than open cannabis vaporizer systems and can be consumed more discreetly.  While open cannabis vaporizer systems may require further tending and processing of cannabis flower, such as grinding into smaller pieces, closed cannabis oil vaporizer systems require no such further processing.  Open cannabis vaporizer systems are not reasonably interchangeable with closed cannabis oil vaporizer systems because they lack the unique characteristics of closed cannabis oil vaporizer systems, including the ease and cleanliness of use as well as discretion.

90.    The most common form of closed cannabis oil vaporizer system is a "510" threaded cartridge, which accounts for nearly 90% of closed cannabis oil vaporizer systems sales in recent years.  The sale of 510 cartridges is much more common than other forms of filled cartridges, filled pods, and all-in-one devices offered by cannabis dispensaries throughout the United States.

91.    An example of a 510 cartridge with cannabis oil or extract in it can be seen below:



FIRST AMENDED CLASS ACTION COMPLAINT

92.    The average wholesale price of an empty, non-filled (with cannabis oil or extract) closed system oil vaporizer cartridge is between $0.80 and $2.00.

93.    ***Closed Cannabis Oil Vaporizer Systems are an Independent Market.***  Because of the differences between varying cannabis consumption methods, closed cannabis oil vaporizer systems are highly specialized products utilized by a core and sophisticated subsection of consumers whose preferences are strong enough to constitute an independent market.

94.    As such, closed cannabis oil vaporizer systems do not exhibit strong, positive cross-elasticity of demand with respect to the price of other cannabis consumption, or even other cannabis vaporizer, products.  Thus, if a hypothetical monopolist were to impose a small but significant non-transitory increase in the price (SSNIP), cannabis oil consumers would not switch to alternative products and thereby render the price unprofitable, because no other product would result in a cannabis consumption product with the unique characteristics discussed herein.

95.    ***High Barriers to Entry.***  The development and manufacture of closed cannabis oil vaporizer systems require a lengthy research and development process, extensive and particular facilities and equipment, as well as exhaustive testing in bench samples and at scale.  In particular, the production of closed cannabis oil vaporizer systems requires suitable manufacturing plants with appropriate equipment and advanced laboratories with specific equipment, including costly and unconventional machines and devices.

96.    In the case of price increases, other manufacturers that compete with Smoore would be unable to respond by promptly altering their production processes to enter the market in order to render the price increase unprofitable, especially because the development process is lengthy, costly, and requires responses to specific technical requirements of cannabis oil manufacturers.

97.    With respect to Smoore, there are substantial barriers to market entry in the Relevant Market because of Smoore's unreasonably restrictive and anticompetitive distribution agreements, as well as horizontal and vertical price controls.

98.    As a result, supply-side substitution is unlikely, and, as such, the possibility of supply-side substitution does not meaningfully constrain prices in the Relevant Market.

FIRST AMENDED CLASS ACTION COMPLAINT

### *Smoore's Products and Dominant Market Power*

99.    ***Smoore's Products.***  Smoore offered and continues to offer for sale cannabis cartridge packaging and capping systems for filling and capping oil-vaporizing cannabis cartridges.

100.    Smoore's products include:

i.    A first tray of deformable material with voids for holding cartridge bodies;

ii.    The cannabis oil cartridge (without any cannabis oil or extract in it);

iii.    A cover that conceals the first tray;

iv.    A second tray with voids for holding mouthpieces; and

v.    The mouthpiece.

101.    Each of these products are used in conjunction with each other to consume cannabis oil or extract.  Smoore's CCELL branded products are sold by over 2,000 different cannabis brands as finished cannabis oil vaporizer products.

102.    CCELL, which Smoore claims is "a technology brand and global innovator in the portable vaporizer space that revolutionized the industry," was a line of closed cannabis oil vaporization system products established by Smoore in 2016 and has become one of the world's largest vaporizer brands.

103.    Smoore, through the CCELL brand, sells wholesale vaporizer hardware directly to cannabis oil and extract producers who then sell those closed cannabis oil system devices to retail outlets (like licensed dispensaries) and directly to consumers, depending on jurisdiction.  Smoore also sells its CCELL brand products to retail outlets (and then to consumers) through its distributors, including the four Distributor Defendants.

104.    CCELL products are also used for all-in-one disposable closed cannabis oil vaporizer systems, including for numerous popular brands purchased by the Class members.

105.    ***Market Power.***  Smoore had and has market power in the closed cannabis oil vaporizer systems market in the Relevant Market, which allows Smoore to unilaterally control prices and exclude competitors, by means other than competition on the merits.  Further, through the anticompetitive conduct as alleged herein, Smoore leveraged its market power in the closed cannabis oil vaporizer system market to exclude and further control and illegally leverage the market

for closed cannabis oil vaporizer systems by utilizing coercive distribution agreements and unreasonable horizontal and vertical pricing and sales agreements.

106.   Because of Smoore's exclusive distribution agreements, Smoore has been able to forestall competition in the Relevant Market, making it unlikely that another entrant could gain a meaningful market share in the Relevant Market at the time of the violations of antitrust law as alleged herein.

107.   Further, the development of products in the Relevant Market is a lengthy, costly and uncertain process.  Barriers to entry are further exacerbated by Smoore's anticompetitive conduct which harms competition in the Relevant Market.  Smoore's actions in totality represent direct evidence of market power.

108.   In particular, Smoore had and has the ability to unilaterally raise prices substantially and utilize that power to exclude competition in the Relevant Market through its dealings with the Distributor Defendants.

109.   Additionally, Smoore's dominant market share gives the Distributor Defendants two options: either participate in Smoore's anticompetitive scheme (including participating in horizontal price fixing and exclusive dealing) or face the consequences of not being able to do business with Smoore, risking the loss of supplier in the Relevant Market with as high as a nearly 80% market share during the statutory period.

110.   Smoore's monopoly power and motivation to throttle competition in the Relevant Market is also reflected in its financial success, as well as that of the Distributor Defendants who benefit from the collective conduct as alleged herein.

### ***Defendants' Anticompetitive Distribution Agreements***

111.   Smoore, through its CCELL brand, distributes its closed cannabis oil vaporizer systems products both by selling directly to cannabis oil and extract producers, and, primarily, through distributors.  Smoore uses its distribution agreements to limit competition in the Relevant Market.  Specifically, on information and belief, Smoore uses the following anticompetitive terms in its distribution agreements (which then have the resulting anticompetitive harms):

FIRST AMENDED CLASS ACTION COMPLAINT

112.  **Exclusivity.**  CCELL distributors are forbidden from selling competing products in the Relevant Market.  This has the effect of distorting competition for different products in the Relevant Market and it forecloses the possibility that others could penetrate the Relevant Market (especially smaller entrants).

113.  For example, Smoore has terminated the distribution of competing products (manufactured by  NLV) through Greenlane – foreclosing NLV from an important distribution opportunity and harming consumers in the process.

114.  **Horizontal Price Fixing.**  CCELL distributors must provide customer lists and prices to Smoore each month in order to police pricing.  Smoore's distribution agreements and this enforcement of pricing policies explicitly and implicitly ban distributors from competing with Smoore or other distributors on pricing.  And, because Smoore also sells its products directly to consumers, Smoore's distribution agreements are effectively horizontal restraints that unreasonably and illegally limit competition in the Relevant Market.

115.  Further, these agreements effectively require distributors to sell Smoore's products at prices or above the prices at which Smoore – a horizontal competitor as well as a manufacturer – sells its products into the Relevant Market.

116.  Smoore also ensures that their distribution agreements are enforced through the use of mandatory reporting by the Distributor Defendants in order to prevent competition and increase prices to closed cannabis oil vaporizer system consumers.

117.  Collectively, this horizontal price fixing is *per se* illegal and it has the effect of eliminating price competition between the Distributor Defendants and Smoore, and leads to higher prices for consumers, like Plaintiffs and Class members.

118.  **Vertical Price Fixing.**  CCELL distributors must sell at CCELL approved pricing. This unlawful price maintenance includes mandatory wholesale price guidelines to restrict price competition between distributors of CCELL products.  This has the effect of controlling the downstream market (and, specifically, prices) by ensuring that end purchasers pay supracompetitive prices in the Relevant Market as opposed to what the market naturally dictates.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

119.   ***Exclusive Dealing.***  CCELL distributors are banned from selling CCELL products to competing distributors and thus Smoore ensures that CCELL's price maintenance and horizontal price fixing cannot be undercut by distributors looking to chip away at Smoore's dominant market share.  This leads to higher prices for consumers.

120.   ***Security Deposits.***  Smoore requires a security deposit and will deduct money for violations of the distribution agreements, including the stringent mandatory price guidelines set by Smoore to fix prices both vertically and horizontally.  This has the effect of locking distributors into Smoore's anticompetitive scheme and allows Smoore to police the Distributor Defendants and enforce the distribution agreements — otherwise the Distributor Defendants are financially penalized.

121.   All in all, rather than allow the Distributor Defendants to compete on the merits in the Relevant Market, these restrictions restrain trade and reduce both intra-brand and inter-brand competition for closed cannabis oil vaporizer systems.

### *Interstate Commerce*

122.   Smoore sells and the Distributor Defendants distribute and sell cannabis vaporizer products in the Relevant Market in a consistent, continuous and uninterrupted manner, affecting the flow of interstate commerce, including in this District.

123.   Thus, the conduct as alleged herein harms interstate commerce and has done so since the anticompetitive conduct began and will continue to do so until the anticompetitive conduct ceases.

### *Antitrust Injury*

124.   Antitrust injury, in the form of suppressed competition and harm to consumers within the Relevant Market, is the sort of conduct that the antitrust laws forbid.

125.   ***Harm to Competition.***  The alleged conduct harms competition because it leads to reduced price competition in the Relevant Market, fewer competitors in the Relevant Market due to exclusionary conduct and high barriers to entry, and throttled incentive to innovate, leading to poorer products (and, therefore, poorer returns) for end users.

126.  **Harm to Consumers.**  The alleged conduct harms consumers because consumers end up paying higher prices due to lack of price competition as well as vertical and horizontal price fixing.  Additionally, consumers have fewer brand choices to choose from because of Smoore's insulation of the Relevant Market from nascent and actual competitors.  Finally, consumers' product options in the Relevant Market are more limited and have less of an incentive to be improved upon due to the conduct of Smoore and the Distributor Defendants.

127.  Many cannabis consumers, especially medicinal cannabis consumers, consume cannabis because they are in a severe amount of pain due to medical ailments.  Defendants prey on this desperation for pain relief and the desire of these folks to be able to live their lives free of health constraints as best they can.  Because Defendants know that these vulnerable consumers are willing to pay premium prices for cannabis products, especially vaporized cannabis products, they use this willingness to pay as cover to collude and act nefariously.

128.  The antitrust laws provide no safe harbor to Defendants who violate them – especially as brazenly as Defendants in this Action.

129.  No safe harbor applies here, and Defendants should be forced to redress Plaintiffs and Class members' injuries.

## V.    CLASS ALLEGATIONS

130.  Plaintiffs bring this Action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, specifically F.R.C.P. 23(a) and 23(b)(3) as representatives of the Class (hereinafter defined collectively as the "Class"), which is defined as follows:

**Nationwide Class.**  All indirect purchaser, end-user consumers in the United States who purchased CCELL closed cannabis oil vaporization products, component parts or all-in-one devices initially designed and manufactured by Smoore from a licensed dispensary or other retailer from January 1, 2016 through the present day or, alternatively, during the statutory period ("Class Period").

131.  Additionally, Plaintiffs bring this Action as representatives of the following subclass of individuals:

**State Indirect Purchaser Class.**  All indirect purchaser, end-user consumers in the state or commonwealth of Arizona, California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Nebraska,

FIRST AMENDED CLASS ACTION COMPLAINT

Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia and Wisconsin and any other unnamed United States indirect purchaser jurisdictions who purchased CCELL closed cannabis oil vaporization products, component parts or all-in-one devices initially designed and manufactured by Smoore from a licensed dispensary or other retailer from January 1, 2016 through the present day or, alternatively, during the statutory period ("Class Period").

132.   Excluded from the Class are Defendants' various subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; and all judicial officers assigned to hear any aspect of this Action.

133.   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

134.   **Numerosity**.  Members of the Class are so numerous that joinder would be impracticable, as millions of Class members exist.

135.   **Commonality.**  Questions of law and fact common to the Class include:

(a) Whether Defendants engaged in anticompetitive acts aimed at unreasonably restraining competition in the Relevant Market;

(b) Whether such conduct violates the Sherman Act and state antitrust statutes;

(c) Whether any or all of the Defendants were unjustly enriched;

(d) Whether such conduct injured the Class members; and

(e) Whether monetary damages and injunctive relief should be provided to Class members as a result of Defendants' wrongful conduct.

136.   **Typicality.**  Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by way of the conduct as alleged herein. Plaintiffs, like all other Class members, were injured by Defendants' uniform conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs.  The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

137.   **Adequacy of Representation.**  Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

of interest that would be antagonistic to those of the other members of the Class. Additionally, the damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

138. **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

139. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

140. Adequate notice can be given to Class members directly using information maintained in the parties' records.

141. **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

142. This proposed class action does not present any unique management difficulties. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050    F: (213) 788-4070  |  clarksonlawfirm.com

individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF THE SHERMAN ACT

### SECTION 1 – UNREASONABLE RESTRAINTS OF TRADE (15 U.S.C. § 1)

### (Against All Defendants)

143.   Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

144.   Beginning sometime before but not later than January 1, 2019 (the "Conspiracy Period"), Smoore and the Distributor Defendants entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act by artificially reducing or eliminating competition for the pricing of closed cannabis oil vaporizer systems products sold indirectly to United States consumers.

145.   Specifically, Smoore's unreasonably restrictive distribution agreements constitute agreements in restraint of trade that were entered into for the purpose of contracting, combining, or conspiring to raise, fix, maintain or stabilize the prices of closed cannabis oil vaporizer system products sold to indirect purchasers in the United States during the Conspiracy Period.

146.   Smoore's distribution agreements for CCELL products include illegal exclusivity agreements which forbids distributors from selling competing products, mandatory price restraints that require distributors sell downstream at prices set by Smoore, banned competition whereby Smoore's distributors are banned from selling Smoore's products to Smoore's competitors and the collection of security deposits on sales to penalize distributors who do not comply with Smoore's pricing restraints.

147.   These restrictions foreclose market entry for smaller entrants, fix prices vertically for downstream purchasers (leading to higher, fixed, or stabilized prices for end-consumers), harm both intra-brand and interbrand competition in the Relevant Market and, because Smoore sells its products directly to consumers, horizontally restrain competition between Smoore and Smoore's distributors (the Distributor Defendants).  This conduct has the effect of fixing prices in the Relevant

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

Market, leading to higher prices for consumers, poorer quality and less safe products, throttled innovation and a lack of inter-brand and intra-brand competition.

148.    Absent these agreements, Smoore and the Distributor Defendants ensure that cannabis oil producers and end consumers, like Plaintiff and the Class members, paid higher prices for closed cannabis oil vaporizer systems than they otherwise would have.  Smoore heavily polices their restrictive agreements in order to prevent competition and increase prices on closed cannabis oil vaporizer system customers who do not buy directly from Smoore.  Critically, Smoore's iron grasp on the cannabis vaporization market and the cooperation of Smoore's distributors ensnares vulnerable cannabis users who depend on cannabis as a form of medicine for severe pain and other ailments.  Finally, Smoore engages in both vertical and horizontal price fixing, as it insulates its distributors from nascent competition and, if a distributor attempts to compete on price for in the Relevant Market, Smoore would be contacted and asked to enforce the agreement between the distributors by warning the other distributors against competing.

149.    As a result of Smoore and the Distributor Defendants' unlawful conduct and acts taken in furtherance of the conspiracy, prices for closed cannabis oil vaporizer system products sold to indirect purchasers in the United States were raised, fixed, maintained or stabilized at artificially inflated levels.

150.    The contract, combination or conspiracy between Smoore and the Distributor Defendants consisted of a continuing agreement, understanding and concerted action among the Defendants.  For purposes of formulating and effectuating their contract, combination or conspiracy, Smoore and the Distributor Defendants did those things they combined or conspired to do, including: (1) agreeing to the anticompetitive distribution agreements, (2) policing the agreements through continuous monitoring of the conspiracy and bilateral communications with distributors, and (3) punishing competitive behavior by any distributor attempting to act in a competitive manner.

151.    As a result of Smoore's unlawful conduct, as well as that of the Distributor Defendants, Plaintiffs and Class members have been injured in business and property by incurring higher costs to procure closed cannabis oil vaporizer system products than it otherwise would have incurred but for Defendants' conduct.

FIRST AMENDED CLASS ACTION COMPLAINT

152.   Plaintiffs and Class members have suffered antitrust injury and damages as a result of Smoore and the Distributor Defendants' unlawful conduct.  Plaintiffs and Class members injuries include supracompetitive prices for products in the Relevant Market and, as such, Plaintiffs and Class members seek declaratory and injunctive relief under this Count.

**COUNT II**

**VIOLATIONS OF STATE ANTITRUST LAWS**

**(Against All Defendants)**

153.   Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

154.   By reason of the conduct alleged herein, Defendants have violated the following state antitrust statutes:

*Arizona's Uniform State Antitrust Act (Ariz. Rev. Stat. § 44-1401)*

155.   **Arizona.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Arizona state law.

156.   Defendants' conduct had the following effects: (1) price competition for cannabis vaporizers sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Arizona; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Arizona.  During the Class Period, Defendants' illegal conduct substantially impacted Arizona's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*California's Cartwright Act (Cal. Bus. & Prof. Code § 16700)*

157.   **California.** Defendants have monopolized trade and entered into an unlawful agreement in violation of California state law.

158.   The violations of California state law consisted, without limitation, of continuing an unlawful trust in the Relevant Market, the objective of which was to raise prices.  This has deprived Californians of free and open competition in the Relevant Market.

159.   Defendants' conduct had the following effects: (1) price competition for cannabis vaporizers sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in California; and (2) prices in the Relevant Market were raised, fixed,

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

maintained, and/or stabilized at artificially higher levels throughout this California.  During the Class Period, Defendants' illegal conduct substantially impacted California's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute including treble damages and reasonable attorneys' fees.

*Connecticut's Antitrust Act (Conn. Gen. Stat. § 35-24)*

160.  **Connecticut.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Connecticut state law.

161.  Defendants' conduct had the following effects: (1) price competition for cannabis vaporizers sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Connecticut; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Connecticut.  During the Class Period, Defendants' illegal conduct substantially impacted Connecticut's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The District of Columbia Antitrust Act (D.C. Code § 28-4501)*

162.  **District of Columbia.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of District of Columbia law.

163.  Due to monopolization and restraints of trade, the citizens of the District of Columbia have paid supracompetitive, artificially inflated prices in the Relevant Market.

164.  Defendants' conduct had the following effects: (1) price competition for cannabis vaporizers sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in the District of Columbia; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout the District of Columbia.  During the Class Period, Defendants' illegal conduct substantially impacted District of Columbia's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201(2))*

165.  **Florida.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Florida state law.

166. Defendants' conduct had the following effects: (1) price competition for cannabis vaporizers sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of cannabis vaporizers in the Relevant Market in Florida; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially impacted Florida's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Illinois Antitrust Act (740 Ill. Comp. Stat. Ann. 10/3(1))*

167. **Illinois.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Illinois state law.

168. Defendants' conduct had the following effects: (1) price competition for cannabis vaporizers sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Illinois; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially impacted Illinois's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Iowa Competition Law (Iowa Code § 553.1)*

169. **Iowa.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Iowa state law.

170. Defendants' conduct had the following effects: (1) price competition for cannabis vaporizers sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Iowa; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially impacted Iowa's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Kansas Restraint of Trade Act (Kan. Stat. Ann. § 50-101)*

171. **Kansas.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Kansas state law.

FIRST AMENDED CLASS ACTION COMPLAINT

172.    Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Kansas; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Kansas.  During the Class Period, Defendants' illegal conduct substantially impacted Kansas's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

### Maine's Antitrust Statute (Me. Rev. Stat. Ann. Title 10 § 1101)

173.    **Maine.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Maine state law.

174.    Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Maine; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Maine.  During the Class Period, Defendants' illegal conduct substantially impacted Maine's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

### Maryland's Antitrust Statute (Md. Code Ann. § 11-204(a))

175.    **Maryland.**    Defendants have monopolized trade and entered into an unlawful agreement in violation of Maryland state law.

176.    Defendants' conduct had the following effects: (1) price competition for in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Maryland; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Maryland.  During the Class Period, Defendants' illegal conduct substantially impacted Maryland's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

### The Michigan Antitrust Reform Act (Mich. Comp. Laws § 445.771)

177.    **Michigan.**    Defendants have monopolized trade and entered into an unlawful agreement in violation of Michigan state law.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

FIRST AMENDED CLASS ACTION COMPLAINT

178.   Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Michigan; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Michigan.  During the Class Period, Defendants' illegal conduct substantially impacted Michigan's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Minnesota Antitrust Law (Minn. Stat. § 325D.49, et seq. & 325D.57)*

179.   **Minnesota.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Minnesota state law.

180.   Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Minnesota; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Minnesota.  During the Class Period, Defendants' illegal conduct substantially impacted Minnesota's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*Mississippi's Antitrust Statute (Miss. Code Ann. § 75-21-1)*

181.   **Mississippi.**   Defendants have monopolized trade and entered into an unlawful agreement in violation of Mississippi state law.

182.   Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Mississippi; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Mississippi.  During the Class Period, Defendants' illegal conduct substantially impacted Mississippi's commerce.   Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Nebraska Junkin Act (Neb. Rev. Stat. § 59-801)*

183.   **Nebraska.**   Defendants have monopolized trade and entered into an unlawful agreement in violation of Nebraska state law.

184.   Defendants' conduct had the following effects: (1) price competition in the Relevant

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Nebraska; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially impacted Nebraska's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Nevada Unfair Trade Practices Act (Nev. Rev. Stat. § 598A.010)*

185. **Nevada.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Nevada state law.

186. Defendants' conduct had the following effects: (1) price competition for in the Relevant Market was restrained, suppressed, and eliminated for purchasers of in the Relevant Market in Nevada; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially impacted Nevada's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*New Hampshire's Antitrust Statute (N.H. Rev. Stat. Ann. Title XXXI § 356)*

187. **New Hampshire.** Defendants have monopolized trade and entered into an unlawful agreement in violation of New Hampshire state law.

188. Defendants' conduct had the following effects: (1) price competition for in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in New Hampshire; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially impacted New Hampshire's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The New Mexico Antitrust Act (N.M. Stat. Ann. § 57-1-1)*

189. **New Mexico.** Defendants have monopolized trade and entered into an unlawful agreement in violation of New Mexico state law.

190. Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in New

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Mexico; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New Mexico.  During the Class Period, Defendants' illegal conduct substantially impacted New Mexico's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*Section 340 of New York's General Business Law (N.Y. Gen. Bus. Law § 340)*

191.  **New York.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of New York state law.

192.  Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in New York; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New York.  During the Class Period, Defendants' illegal conduct substantially impacted New York's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The North Carolina General Statutes (N.C. Gen. Stat. § 75-1)*

193.  **North Carolina.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of North Carolina state law.

194.  Defendants' conduct had the following effects: (1) price competition for in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in North Carolina; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout North Carolina.  During the Class Period, Defendants' illegal conduct substantially impacted North Carolina's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The North Dakota Uniform State Antitrust Act (N.D. Cent. Code § 51-08.1-01)*

195.  **North Dakota.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of North Dakota state law.

196.  Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in North Dakota; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265   P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

artificially higher levels throughout North Dakota. During the Class Period, Defendants' illegal conduct substantially impacted North Dakota's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

### *Oregon's Antitrust Law (Or. Rev. Stat. § 646.705)*

197. **Oregon.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Oregon state law.

198. Defendants' conduct had the following effects: (1) price competition the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Oregon; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Oregon. During the Class Period, Defendants' illegal conduct substantially impacted Oregon's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

### *The Puerto Rican Anti-Monopoly Act (P.R. Laws Title 10 § 260)*

199. **Puerto Rico.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Puerto Rico law.

200. Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Puerto Rico; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Puerto Rico. During the Class Period, Defendants' illegal conduct substantially impacted Puerto Rico's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

### *The Rhode Island Antitrust Act (6 R.I. Gen. Laws § 6-36-1)*

201. **Rhode Island.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Rhode Island state law.

202. Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Rhode Island; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Rhode Island. During the Class Period, Defendants' illegal

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

conduct substantially impacted Rhode Island's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*South Dakota's Antitrust Statute (S.D. Codified Laws § 37-1-3.1)*

203. **South Dakota.** Defendants have monopolized trade and entered into an unlawful agreement in violation of South Dakota state law.

204. Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in South Dakota; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout South Dakota. During the Class Period, Defendants' illegal conduct substantially impacted South Dakota's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Tennessee Trade Practices Act (Tenn. Code § 47-25-101)*

205. **Tennessee.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Tennessee state law.

206. Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Tennessee; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Tennessee. During the Class Period, Defendants' illegal conduct substantially impacted Tennessee's commerce. Accordingly, Plaintiffs and Class members seek all forms of relief available under this statute.

*The Utah Antitrust Act (Utah Code Ann. § 76-10-3101)*

207. **Utah.** Defendants have monopolized trade and entered into an unlawful agreement in violation of Utah state law.

208. Defendants' conduct had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in Utah; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Utah. During the Class Period, Defendants' illegal conduct substantially

1    impacted Utah's commerce.  Accordingly, Plaintiffs and Class members seek all forms of relief

2    available under this statute.

3    *West Virginia's Antitrust Statute (W. Va. Code § 47-18-1)*

4    209.  **West Virginia.**  Defendants have monopolized trade and entered into an unlawful

5    agreement in violation of West Virginia state law.

6    210.  Defendants' conduct had the following effects: (1) price competition in the Relevant

7    Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in West

8    Virginia; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at

9    artificially higher levels throughout West Virginia.  During the Class Period, Defendants' illegal

10   conduct substantially impacted West Virginia's commerce.  Accordingly, Plaintiffs and Class

11   members seek all forms of relief available under this statute.

12   *The Wisconsin Antitrust Act (Wis. Stat. § 133.01)*

13   211.  **Wisconsin.**  Defendants have monopolized trade and entered into an unlawful

14   agreement in violation of Wisconsin state law.

15   212.  Defendants' conduct had the following effects: (1) price competition in the Relevant

16   Market was restrained, suppressed, and eliminated for purchasers in the Relevant Market in

17   Wisconsin; and (2) prices in the Relevant Market were raised, fixed, maintained, and/or stabilized

18   at artificially higher levels throughout Wisconsin.  During the Class Period, Defendants' illegal

19   conduct substantially impacted Wisconsin's commerce.  Accordingly, Plaintiffs and Class members

20   seek all forms of relief available under this statute.

21   213.  Under the laws of each of these states, indirect purchasers have standing under the

22   antitrust and consumer protection statutes to maintain an action based on the facts alleged in this

23   Complaint.

24   214.  There are no procompetitive benefits that outweigh the anticompetitive effects of

25   Defendants' monopolization and restraint of trade in the Relevant Market.

26   215.  Accordingly, Plaintiffs and Class members are entitled to all forms of relief, including

27   actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050    F: (213) 788-4070  |  clarksonlawfirm.com

FIRST AMENDED CLASS ACTION COMPLAINT

## VII.  PRAYER FOR RELIEF

216.  To remedy these illegal acts, Plaintiffs request that this Court:

a.  Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class and appoint Plaintiffs as representatives of the Class;

b.  Find that Defendants' conduct was unlawful, as alleged herein;

c.  Award such declaratory relief, injunctive relief and other equitable relief as the Court deems just and proper;

d.  Award Plaintiffs and Class members statutory, actual, compensatory, consequential, treble, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

e.  Award Plaintiffs and Class members pre-judgment and post-judgment interest;

f.  Award Plaintiffs and Class members reasonable attorneys' fees, costs and expenses; and

g.  Grant such other relief as this Court deems just and proper.

## VIII.  JURY DEMAND

217.  Plaintiffs demand a trial by jury so triable on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED: March 07, 2025.                          **CLARKSON LAW FIRM, P.C.**

_/s/ Yana Hart_
Ryan Clarkson, Esq.
Yana Hart, Esq.
Mark Richards, Esq.
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Email:rclarkson@clarksonlawfirm.com
Email:yhart@clarksonlawfirm.com
Email:mrichards@clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265    P: (213) 788-4050    F: (213) 788-4070  |  clarksonlawfirm.com

**SULTZER & LIPARI, PLLC**
Jason R. Sultzer (*PHV forthcoming*)
Scott E. Silberfein (*admitted PHV*)
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12061
Tel: (845) 483-7100
Email: sultzerj@thesultzerlawgroup.com
Email: silberfeins@thesultzerlawgroup.com

**LEEDS BROWN LAW, P.C.**
Jeffrey K. Brown (*PHV forthcoming*)
Blake Hunter Yagman (*admitted PHV*)
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel: (516) 873-9550
Email: jbrown@leedsbrownlaw.com
Email: byagman@leedsbrownlaw.com

**THE FERRARO LAW FIRM, P.A.**
James L. Ferraro (*PHV forthcoming*)
James L. Ferraro Jr. (*PHV forthcoming*)
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Tel: (305) 375-0111
Email: jferraro@ferrarolaw.com
Email: james@ferrarolaw.com

*Attorneys for Plaintiffs and the Proposed
Class(es)*

FIRST AMENDED CLASS ACTION COMPLAINT